IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| KENT TAYLOR,<br><br>              Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>              Defendant. | CV 12–59–H–CCL<br><br><br>OPINION & ORDER |

This case arises from a Forest Service prescribed burn on a 500-acre plot of

land (the "Davis 5 Unit") on the Helena National Forest, Lincoln Ranger District,

that escaped and became a 2,000 acre wildfire, burning undeveloped timber land

belonging to the Plaintiffs near Lincoln, Montana. Plaintiff asserts a claim under

the Federal Tort Claims Act for negligence. Now before the Court are the parties'

cross-motions for summary judgment. The United States filed a Motion for

Summary Judgment on Discretionary Function and Strict Liability (Doc. 37). It is

the government's position that Plaintiff's suit is barred by the discretionary

function exception to the Federal Tort Claims Act and that, further, there is no waiver of sovereign immunity to pursue the United States on strict liability claims. In response, the Plaintiffs filed a Motion for Summary Judgment as to the Government's Affirmative Defense of Discretionary Function (Doc. 24), and a Partial Motion for Summary Judgment as to Liability (Doc. 26). The motions came on for hearing on September 26, 2014. Plaintiffs were represented by John Heenan, and the United States was represented by AUSA Victoria Francis and AUSA Timothy Cavan. The Court, having heard the arguments of the parties and having reviewed the briefs, affidavits, declarations, and all the record, is prepared to rule.

While the cross-summary judgment motions were pending, four of five Plaintiffs moved to dismiss their claims against the United States. Plaintiff Kent Taylor is thus the only remaining plaintiff.

**Background**

Before explaining in detail the facts associated with this case, the Court will sweep away a few erroneous allegations. First, the prescribed burn was not ignited under a "red flag warning." Second, although Lewis and Clark County did have a "no burn" prohibition in effect on the relevant date, that prohibition was irrelevant to the prescribed burn both because it had no legal effect on Forest Service land and also because the "no burn" prohibition was particularly directed to the dry conditions found generally throughout the county, and especially on the valley floors. The county's "no burn" prohibition was not applicable to the Davis 5 Unit because the land was at 7,000 foot elevation and was much wetter than the rest of the county. With two inches of rain in August on this unit of Forest Service land, there were fall-like conditions in the area of the prescribed burn. Third, the Forest Service did make substantial efforts in advance to notify property owners and public officials in the area of the prescribed burn by notifying Montana Department of Natural Resources, several local fire departments, the county sheriff's office, several public officials, and seasonal cabin owners by door-to-door notification. Fourth, this prescribed burn turned wildfire is not, and never

has been, a case of clear liability. Lastly, this escaped fire was a rare event: of the 4500 prescribed burns per year conducted by the Forest Service, approximately 9 escapes occurred per year during the period 2008-2012. That said, the Court continues on to describe the detailed facts of the case.

In 1998, after an Environmental Impact Statement was completed, then-Forest Supervisor for the Helena National Forest, Thomas Clifford, issued his Record of Decision on the Poorman Project. (Exhibit C, Doc. 44-3.) The Poorman Creek area is located approximately 11 miles southeast of Lincoln, Montana and is part of the Lincoln Ranger District. This area of forest was found to be at risk of epidemic mortality due to insects and due to the potential for large-scale fires, resulting in part from decades of fire suppression. The Forest Supervisor concluded that the conditions of elevated fuels in the Poorman Project area could not be sustained. The Poorman Project Decision implemented management practices of various types (prescribed burn, precommercial thinning, commercial thinning, regeneration harvest, regeneration burn) for the purpose of maintaining grasslands, promoting sustainable forest ecosystems, and lowering fire risk by reducing fuels.

One of the prescribed burns planned as part of the Poorman Project was the Davis 5 Unit Prescribed Burn in the Lincoln Ranger District. This portion of the project was difficult to schedule due to its high elevation, resulting in snow lasting long into the spring and rain in the fall. (Dec. Romero, Doc. 42-1 at 12.) The Davis 5 Burn Plan (the "Burn Plan") was prepared in July, 2009, and updated in March, 2010, to prepare for a prescribed burn of approximately 500 acres at high elevation (6200 feet to 7430 feet elevation). (Exhibit D, Doc. 44-4.) The goal of the burn was to promote the health of grasses and White Bark Pine trees and to reduce the presence of ladder fuels such as conifers that could cause future crown fires. The Burn Plan is an extensive, 120-plus page document, including appendices, that identifies and discusses the twenty-one topics that must be addressed in a U.S. Forest Service Prescribed Burn Plan as prescribed by the "Interagency Prescribed Fire Planning and Implementation Procedures Guide." (Exhibit E, Doc. 44-5.). The complexity of the prescribed burn was determined to be moderate. The consequences of and the risk that the prescribed burn could escape its boundaries and enter private lands one-half mile from the project area (the private lands owned by Plaintiffs in this case) was explicitly considered by the Burn Plan, and the risk of escape to private lands was deemed to be low due to

prevailing winds and an analysis based on computer modeling. (Doc. 44-4 at 26.)

The expected time of year for the prescribed burn was spring or fall, although any

time of year that provided the appropriate prescription parameters could be

utilized (McBratney Decl., Doc. 44 at ¶25.). Several prior spring and fall seasons

had proved to be too wet to permit the prescribed burn. In August of 2010,

however, unusually rainy weather in June and early August had provided extra

moisture to the project area, so at mid-month the Burn Plan was reviewed for

possible execution.

Beau Macy and Jarel Kurtz were the Prescribed Fire Burn Bosses who

prepared the Prescribed Fire Plan. They are both qualified for a Type 2 prescribed

fire. The Lincoln Ranger District Fire Management Officer, Jay Lindgren (who is

qualified as a Type 1 Burn Boss), served as the Technical Reviewer of the Burn

Plan. (Decl. B. McBratney, Doc. 44 at 10.) Lindgren also served as the Burn Boss

for the Davis 5 Prescribed Burn.

On August 24, 2010, the Fire Management Officer for both the Helena and

Lewis and Clark Forests, Bradley McBratney, met with Lindgren to review the

proposed Davis 5 Prescribed Burn and the weather forecast. McBratney had been

involved with 75 prescribed fires in the past. (Doc. 44, ¶ 1.) Lindgren had been

involved with about 100 prescribed fires in the past. (Doc. 41, ¶ 1.) Together, McBratney and Lindgren obtained a spot weather forecast from the National Weather Service (Great Falls, Montana) and also telephoned a meteorologist there to discuss the forecast beyond Thursday. (Doc. 44 at ¶¶ 14-15, Doc. 41 ¶ 11.) The anticipated weather for the next day, Wednesday, August 25, was within prescription, meaning that it met the temperature, wind, and humidity parameters of the Burn Plan. (Doc. 44 at ¶ 22.) Because of the size of the area, McBratney considered this to be a moderate risk burn. (Doc. 44 at ¶ 16.) The method of ignition (by hand), the lack of nearby residences or major power lines, the lack of complex fuel types, and the ample staffing and resources available all pointed to a burn of moderate complexity only. Lindgren planned to have available 6 fire engines with water, two folding water tanks (6,000 gallons and 1,500 gallons), and a pump to help contain the burn within the unit boundaries. Lindgren also had 36 people involved in the ignition (available also for fire suppression as needed) and additional employees on the engines and water tanks . (Doc. 41, ¶ 13, ¶ 18.) There had been no fires in the Lincoln Ranger District at this point in time. (Doc. 41-2 at 3.) McBratney made the decision "[b]ased on [his] general knowledge as to whether the Helena National Forest was in 2010 with the extra moisture this

was a good opportunity to meet the planned management of the area and an appropriate risk to take." (Doc. 44 at ¶ 24.) Both McBratney and Lindgren knew that a cold front and weather watch were predicted for Thursday afternoon, but they believed that the prescribed burn could and would be executed and mopped on Wednesday afternoon, and that the predicted rainfall that would follow the cold front over the weekend would ensure that the burn was put out. (Decl. Lindgren, ¶ 11.)

District Ranger Amber Kamps, who had approved the actual Burn Plan on July 15, 2009, and again on March 3, 2010, met with Lindgren and reviewed the Burn Plan and the weather for Wednesday and Thursday, August 25-26, 2010. District Ranger Kamps approved the Prescribed Fire Plan, Doc. 44-4 at 19, including the Go/No Go document for the Plan. (Kamps Depo. at 4-5, 17 (conventionally filed).) In turn, District Ranger Kamps telephoned the Acting Supervisor for the Helena National Forest, Nancy Peak, discussing the Burn Plan, the staffing, and weather issues. (Doc. 40, ¶ 3.) Acting Supervisor Peak knew that the Poorman Project NEPA land management plan prescribed this fire treatment and that Ranger Kamps was authorized to prescribe fire in the Lincoln Ranger District. (Doc. 40, ¶ 4.) Acting Supervisor Peak approved Amber Kamps as the

Line Officer for the Davis 5 Burn. (Doc. 40, ¶ 4.) However, the District Ranger had authority to approve this fire and did not require the approval of the Forest Supervisor. (Kamps Demo. at 20-23.) The Prescribed Fire Guide that has been adopted by the Forest Service gives authority for Go/No Go to either a Forest Supervisor or a District Ranger. (McBratney Decl. ¶¶ 11, 32; Ex. E at 11 (Bates 0673); Ex. G at 14 (Bates 0195).)

On Wednesday, August 25, the prescribed burn was attempted at 10:45 a.m. and at 12:00 noon, but humidity was too high for ignition at those times. (Doc. 41, ¶19.) A third attempt at around 1:00 p.m. appeared to be successful, so hand ignition crews commenced work. The prescription parameters[1] for temperature, wind, and humidity were all met at the time of ignition. (Dec. McBratney, Doc. 44, ¶ 27 ("A review of the on-site weather measurements shows that they were within the prescription."). On-site weather measurements were required prior to ignition, at the time of ignition, and every half hour after ignition to make sure that conditions stayed within the Burn Plan prescription. In fact, the conditions

---

[1] The prescription called for "[t]emperature between 55 and 75 degrees, relative humidity between 20 and 40 degrees, and midflame wind speed between 5 and 15 miles per hour." (Doc. 41 at ¶ 17, citing McBratney Exhibit D, Bates 00030 (Doc. 44-4 at 29).) "Midflame wind" is at eye level. (Doc. 41 at 11.)

continued to stay within prescription even after spotting outside the burn unit

caused Lindgren to shut down ignition:

> At 1:00 p.m. or 1300 hours temperature was at 70 degrees, relative
> humidity at 35% and winds from the southwest at 3-5 mph. At 1:30
> p.m., 1330 hours, temperature was 72 degrees, relative humidity at
> 31% and winds from the southwest at 3-5 mph. At 2:00 p.m., 1400
> hours, temperature was 74 degrees, relative humidity at 31 percent
> and winds from the southwest at 3-5 mph. ... [A]t 1545 hours
> [temperature was] at 74 degrees, 29% humidity and wind from the
> southwest at 5-7 mph; and at 1630 [temperature was] at 75 degrees,
> 25% relative humidity, winds from the Southwest at 5-7 mph and
> gusts at 10 mph.

(Doc. 41, ¶ 17.) Unfortunately, between 1:00 p.m. and 2:00 p.m., the direction of

the wind began to change from up-slope to cross slope and wind intensity began to

increase, with mixing of winds from high elevation. The first spot sighted outside

the unit caused ignition to be shut down, and by 2:15 p.m. all crews began fire

suppression activities. In the evening, around 10:30 p.m., the crews were taken off

the fire because it was not moving and had calmed down (which is common during

night time). One engine crew continued to monitor the fire. (Doc. 41 ¶ 20.) The

decision not to fight the fire through the night was made by Burn Boss Lindgren

for the safety and protection of the firefighters. (Doc. 41 at 13 "there is increased

danger of trees falling and snags falling injuring firefighters . . . as well as crew

needing rest for the next day".)

At 8:00 a.m. the next morning, Thursday, August 26, approximately 70 people with additional support from a helicopter crew and 3 more fire engines and 3 water tenders, began working to suppress the fire. At mid-day on Thursday, wind speed increased and the fire became a more active crown fire. The fire was declared a wildfire at approximately 1:00 p.m. on August 26. A Type 2 Incident Management Team was ordered, as well as air tankers, helicopters and other additional resources. By evening, the fire grew to 1,600 acres on federal land, and it also spread into almost 300 acres of private land owned by the five Plaintiffs in this case. The government estimates that the burned private timber land for all five Plaintiffs was 121 acres. (Doc. 43-1 at 1.) It took three more days to put out the fire.

Although this prescribed burn was expected to take only a few hours, it was an ambitious project in that the burn had to be completed within 24 hours before unfavorable weather conditions were expected. (Decl. Romero, Doc. 42-1, at 33.) The Burn Plan was not perfect, and in hindsight the fuel model chosen would be corrected and more attention would have been given to the potential for spotting and crown fire, but there were numerous advantages that weighed in favor of the

Burn Plan and the prescribed burn. (Decl. Romero, Doc. 42-1 at 33 ("They had large barriers to fire spread all around them, they had a very wet season to date, they had more personnel and equipment than the plan required, and they expected the operation would be complete in a few hours and the ample personnel and equipment they had on scene would have the fire controlled and mostly out before the critical fire weather arrived the following day.").) Given the "uniquely wet summer and wet August," the Burn Boss and crews were taken somewhat by surprise by the fire spotting outside the burn unit and the aggressive nature of the fire that escaped. (Doc. 41, ¶ 22.)

However, the escaped fire was not caused by any violation of Forest Service regulation or policy, and the Burn Plan was prepared and executed according to regulation and policy. The decision to execute the Burn Plan on August 25, 2010, was not outside the "standard of care" for prescribed fires. (Decl. Romero, Doc. 42-1 at 33.) In fact, among the lessons learned from this fire and other similar wildfires is a growing recognition that analysis and computer modeling that was considered appropriate in the past may need to be revised to take into account

unusual fire behavior in forests infected with mountain pine beetle. (Doc. 42-2.)[2]

Thus, and although it may provide small comfort to the parties in this case, the

escaped fire from the Davis 5 Burn may be an instance of environmental changes

(the extent of which is currently unknown) giving rise to unforeseen consequences

which will in turn push and lead to the necessary revisions in fire analysis and

computer modeling that will benefit future project management. (Decl. Lindgren,

Doc. 41-2, at 4 "[t]rying to write burn plans with no accurate Fuel Model to use.")

An independent review team found no violations of Forest Service policy in

relation to the Davis 5 Unit prescribed burn. The review also found that all key

personnel met or exceeded minimum qualifications for each position. Finally, the

---

[2] USFS expert Romero cites the 2012 Annual Report of the Fire Modeling Institute (Rocky Mountain Research Station, Missoula Fire Sciences Laboratory), wherein scientists notes "the difficulty of modeling mountain pine beetle-attacked fuels with existing fire behavior models." *See* www.firelab.org/document/fmi-annual reports/2012 FMI Annual Report.pdf at p. 30. In other words, two years *after* the Davis 5 Burn was prepared and executed, fire scientists began to note "a growing recognition that crown trees are not well modeled by these existing linked model systems and that crown fires in general are poorly understood (see review by Cruz and Alexander [2010]). Additionally, it is recognized that these models are biased toward under-predicting the occurrence of active crown fires." Jolly, W.M.; Parsons, R; Varner, J.M.; Butler, B.W.; Ryan, K.C.; Gucker, C.L. 2012 Do mountain pine beetle outbreaks change the probability of active crown fire in lodgepole pine forests? Ecology 93(4): 9431-946. Available at: www.fs.fed.us./rm/pubs_other/rmrs.2012.jolly_m002.pdf.

review team found that the prescribed fire plan was prepared by appropriate certified personnel.

According to Plaintiff Taylor, 142 acres were burned (out of 146). According to the government, burned timber can be found on 36 acres belonging to Taylor.  Taylor did not have a cabin on his property, had no electricity or water on the property, and had not visited the property since he purchased it.  (Taylor Demo. at 21, 30, 32.)  Glenda Scott, Forest Service certified silviculturist/ reforestation specialist, in consultation with a forest pathologist, opined that slightly more than half of Plaintiff Taylor's timber (over 5" diameter breast height) were "killed by bark beetle prior to the fire."  (Doc. 43-1 at 2.)  The government's appraisal of the diminution in fair market value of Plaintiff Taylor's property is $21, 900.  (Doc. 32-6 at 3.)

Ms. Scott opines that the total cost of reforestation for all five plaintiffs' 121 acres of burned timber land is $207,515. The government's reforestation plan is to remove burned trees and plant 436 lodgepole seedlings (5-12" tall with 6" root system) per acre.  (The government's surveys indicate that natural regeneration is already producing in some acres an additional 400 lodgepole seedlings per acre. (Doc. 53, Def. Brief at 7.))  The proposed planting is expected to produce trees 5

feet or higher in 10 years and 17 feet or higher in 20 years. (Doc. 53, Def. Brief at 8.) In contrast, the Plaintiffs' expert proposes a $27 million reforestation plan. (Doc. 53, Def. Brief at 10.)

**Legal Standard**

Summary judgment is proper when the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden of demonstrating the absence of a genuine issue of fact is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden has been met, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Under the Federal Tort Claims Act ("FTCA"), the United States is liable "if a private person would be liable to the claimant in accordance with the law of the place where the act or omission." 28 U.S.C. § 1346(b). "The FTCA waives the government's sovereign immunity for tort claims arising out of negligent conduct of government employees acting within the scope of their employment." *Terbush*

*v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008). The law to be applied in this case is place where the act occurred. *See* 28 U.S.C. §1346(b)(1). There is no waiver of sovereign immunity for strict or absolute liability claims. *Laird v. Nelms*, 406 U.S. 797, 799 (1972); *Dalehite*, 346 U.S. at 44-45; *Borquez v. United States*, 773 F.2d 1050, 1052 (9th Cir. 1985).

In this case, the acts complained of occurred in Montana, so the substantive laws of Montana apply. A plaintiff must prove these elements: (1) existence of a duty, (2) breach of that duty, (3) actual and proximate cause, and (4) damages. *Peterson v. Eichhorn*, 344 Mont. 540, 189 P.3d 615, ¶23 (Mont. 2008). However, "negligence is not inferable from the mere occurrence of the accident...." *Callahan v. Chicago, B. & Q.R. Co.* 47 Mont. 401, 133 P. 687, 691 (Mont. 1913) (quoting *Hardesty v. Largey Lumber Co.*, 34 Mont. 1551, 86 Pac. 29 (Mont. 1906) (but noting the exception of rebuttable presumption when thing causing injury is under management and control of defendant and accident of type not to occur with use of proper care).

However, FTCA only partially waives sovereign immunity. Under the FTCA, the government is exempt from liability incurred by a government employee when performing a discretionary function. 28 U.S.C. § 2680(a). This

exception covers all discretionary acts, even if the act is negligently performed or involves an abuse of discretion. *Dalehite v. U.S.*, 346 U.S. 15, 32 (1953). Discretionary function is defined to include:

> determinations made by executives or administrators in establishing plans, specifications or schedule of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

*Dalehite*, 346 U.S. at 35-36. Neither is discretionary function confined to planning and policy decisions. It also refers to day-to-day management of operations, which "regularly requires judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). To demonstrate discretionary function immunity, as is the government's burden, *see Miller v. United States*, 163 F.3d 591, 594 (9th Cir. 1998), one must show (1) the action taken involved an element of choice, *see Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001), and (2) the action taken was based on considerations of public policy, *see Gaubert*, 499 U.S. at 323. Policy decisions are "grounded in social, economic, and political policy." *Varig Airlines*, 467 U.S. at 813. Even

relatively prosaic choices such as how to fight a fire involve "the type of economic, social, and political concerns that the discretionary function exception is designed to protect" because such choices involve "a balancing of considerations, including cost, public safety, firefighter safety, and resource damage." *Miller* 163 F.3d at 595.

**Discussion**

The multitude of choices faced by key decision makers of the Forest Service and its employees is described above in some detail. It is also clear that the Forest Service's decision to manage its resources in the Lincoln Ranger district was driven by competing policy considerations. The purpose behind the action was to "maintain healthy, sustainable ecosystems that 1) reduce fire risk, 2) provide wildlife habitat similar to the habitat that existed when fire was a natural component of the ecosystem, 3) protect soil and water, 4) provide recreation opportunities, and 5) provide wood for people's use." (Doc. 39 at 6, ¶4 (Poorman DEIS, Bates 1017).)

The Forest Service manages its lands for multiple uses, *see* Multiple Use and Sustained Yield Act, 16 U.S.C. § 528-531, and must also provide fire management, *see* National Forest Management Act, 16 U.S.C. § 1600 et seq.

18

Prescribed burns remove debris, assist reforestation, reduce hazardous fuels, and restore ecosystems. (Romero Decl. expert report at 6.) Balancing concerns about protecting resources and reducing risk of catastrophic fire in the future, with concerns regarding fire escape, safety, and costs means balancing competing social, political, and economic policy objectives, all of which were extensively considered in the Poorman Project environmental impact statement and the Record of Decision. (Doc. 44, McBratney Decl., Ex. B (Bates 1023-1024).)

Plaintiff's attempt to assert a claim of absolute liability for fire pursuant to Montana Code Annotated § 50-63-103 is ineffective. The government's sovereign immunity bars claims on theories of strict or absolute liability for ultra-hazardous activities. *See Laird v. Nelms*, 406 U.S. 797, 798-99 (1972). Plaintiff's attempt to assert a claim of negligence is also ineffective because it is not demonstrated by the facts of this case and, more importantly, the discretionary function exception applies. Finally, as to Plaintiff's argument that the prescribed burn in this case was marred by other wrongful acts or omissions, Forest Service policy permits either forest supervisors or district ranger to approve prescribed fires, *see* Doc. 44, McBratney Decl. Ex. E, at 11 (Bates 0673), and in this case both the Acting Forest Supervisor and the District Ranger approved the prescribed burn at issue.

Plaintiffs have filed a motion to strike the government's expert report prepared by Forest Service forester Glenda Scott, on the theory that her testimony is not relevant to a proper measurement of damages under Montana law. Plaintiffs have sought restoration damages, and the government's expert does not consider planting 3-6 foot nursery trees to be an option.

While there is a line of cases under Montana law that supports a damage award sufficient to restore property that has been temporarily injured, *see Lampi v. Speed*, 261 P.3d 1000 (Mont. 2011), and *Sunburst School District No. 2 v. Texaco, Inc.*, 165 P.3d 1079 (Mont. 2007), such restoration must be reasonable, plaintiff must show objectively reasonable "reasons personal" to justify restoration of the property, and plaintiff must "establish that the award will actually be used for restoration...." *Lampi*, 261 P.3d at 1006. There are in this case real questions whether the Plaintiffs can show objectively reasonable 'reasons personal' to restore their property and whether any of the Plaintiffs would--or even could-- actually use such a substantial award ($27 million between five plaintiffs) to restore their property. A plaintiff in these circumstances is not permitted to simply pocket a damages award as profit. *See McEwen v. MCR, LLC*, 291 P.3d 1253 (Mont. 2012).

In this case, the government's expert report is highly relevant to Plaintiff's claim for damages because the report demonstrates why Plaintiff Taylor's request for restoration damages is doubtful. The government's expert shows that the Plaintiff's expert plan for reforestation lacks sufficient grounding in experience or science and could not actually be implemented. Plaintiffs' Motion to Strike Government's Expert Testimony is without merit.

**Conclusion**

The Court concludes that Plaintiff has failed to demonstrate that the Forest Service was negligent either in conducting the Davis 5 Unit prescribed burn or in fighting the escaped fire once it occurred or that the Forest Service violated any mandatory policy or prescription. In addition, and more significantly, strict liability does not apply and the discretionary function exception applies to bar Plaintiff's tort claims.

The United States has carried its burden to demonstrate that there is no genuine issue of material fact and that the United States is entitled to judgment as a matter of law. The United States is immune from this suit.

Accordingly,

IT IS HEREBY ORDERED that Plaintiff's Motion to Strike Government Expert Report (Doc. 31) is DENIED.

IT IS FURTHER ORDERED that the United States' Motion for Summary Judgment (Doc. 37) is GRANTED, and Plaintiff's Motions for Summary Judgment (Doc. 24 and Doc. 26) are both DENIED. All relief is denied to Plaintiff.

The Clerk shall enter judgment accordingly.

Dated this 22nd day of March, 2015.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE